*1177 OPINION.
Opper:
Considering first the related issues of depletion of minerals and of development expense, we have found the facts in petitioner’s favor as to the disputed extent of the limestone deposit apparently available for profitable removal. The result has been reached not so much through acceptance of petitioner’s contention that mineral deposits not subject to extraction within a 40-year period are valueless as on categorical evidence of the actual quantity of limestone present. That this appears to coincide approximately with the amount of anticipated use in 40 years, we must regard as accidental. Facts or estimates as to total cost, as to the value of surface land, of plant site, and of clay deposit, and as to the quantity of clay, being undisputed or not seriously contested, the allocation of the proportion of the investment applicable to the limestone and the ascertainment for purposes of measuring depletion of the cost applicable to each ton of mineral consumed is a matter of mere mathematical calculation. As its measure of depletion of development costs, petitioner advances an allocation of these costs as between limestone and clay which is undisputed, and then computes annual deductions upon the same assump *1178 tions as to mineral quantities as it used in figuring depletion of the mineral. For the same reasons it is our view that these figures maybe accepted. Petitioner’s computation of depletion deductions is accordingly approved.
We have accepted petitioner’s figures in the main on the depreciation question also. The parties are in agreement that the use of the “unit of production” method in arriving at the depreciation figure for each year was proper; and apparently respondent does not question petitioner’s selection of a barrel of “clinker”—a mixture of clay and limestone—as an appropriate unit. The parties are in dispute as to the probable life of the plant and as to the number of units which it should be assumed that the plant will produce during that life.
The finding which we have made as to the anticipated life of the plant as a whole is a conclusion drawn from the entire record. Testimony on behalf of petitioner was given by one of its officers. It was to the effect that “from our- experience and the replacements that have been made and those that are planned for the immediate future, we have knowledge that we could not expect more than 20 years for the life of that plant.” That is a somewhat less than satisfactory factual basis for a finding by the Board. Primrose Tapestry Co., 20 B. T. A. 702; Woodside Cotton Mills Co., 13 B. T. A. 266, 269. On the other hand, respondent’s witness, an engineer apparently familiar with plants of the general type to which petitioner belongs, had worked in plants where the equipment used “is quite old, in fact it varies probably between 25 and 30 years.” In a document filed earlier with respondent petitioner assumed for the useful “Entire Life” of its plant “1927-1951—23½ years.” On all the evidence the figure which we have adopted, 22½ years, seems to us a reasonably conservative estimate of probable useful life.
The apparently inadvertent use by petitioner of a full year for its operations at the time it commenced production, instead of the half year (or less) indicated by the facts, requires some change in the length of the period of past experience upon which the total units which the plant is capable of producing are to be estimated. We have used for that purpose all of the company’s history which appears in the record, thus adopting a 12^year period instead of the 12 years used by petitioner. The total number of units produced during that time of course likewise varies somewhat from the figure employed by petitioner. However, ascertainment of the average annual unit production in the past and multiplication of that figure by the years of anticipated life will give the figure which seems to us most nearly to approximate the total unit production which is reasonably to be expected from the plant. The cost of the plant being undisputed, the portion *1179 thereof attributable as depreciation to each unit is likewise merely a problem in arithmetic. And there being no dispute as to the number of units produced in each taxable year, the depreciation to be allowed for the years before us may readily be fixed.
On the last issue petitioner claims to be entitled to a credit under either section 26 (c) (1) or 26 (c) (2). Its contention under the former section is that the first and second mortgages to which its property was subject were contracts preventing it from declaring and paying dividends out of its earnings and profits. It constructs that conclusion as follows: The mortgages excepted earnings from the operation of the indentures until possession should be taken by a receiver, by the trustee or otherwise under the first mortgage; and until default, under the second. Petitioner argues that the functioning of a bondholders’ committee constituted the equivalent of the action necessary to bring the earnings and profits within the scope of the mortgaged property, and thereby to preclude their use for distribution as dividends. For the sake of the argument we may assume that to be true, although, as respondent points out, the bondholders’ committee did not take possession of the property, but acted in a purely advisory capacity, leaving the corporation and its officers to manage and operate petitioner. But, in any event, the action relied on is insufficient to satisfy the statutory requirement that the contract should in the first instance “expressly” deal “with the payment of dividends.” There is nothing in the contract making any reference to the declaration of dividends either before of after possession of the corporate property is relinquished by the debtor. Such action, of course, could have the practical effect of foreclosing the corporation from the ability to operate; and, among other things, incidentally, to declare dividends. But the statute requires that the contract expressly deal with the payment of dividends and no language in it has been or can be pointed out by petitioner which fulfills that condition. There are many other situations where as a practical matter a corporation1 is prevented from the declaration of any dividend, but, unless Congress has seen fit to include such a case within the carefully limited language of the sections authorizing the credit, it has been repeatedly held that the credit is not available. See, e. g., Crane Johnson Co., 38 B. T. A. 1355; affd. (C. C. A., 8th Cir.), 105 Fed. (2d) 740; affd., 311 U. S. 54.
Thus, when petitioner asks the rhetorical question: “Will any one seriously argue that this [bondholders’] committee would allow petitioner to pay dividends while it was in default as to principal and interest on its bonds?”, it is voicing what is perhaps the inevitable practical effect of the situation in which it found itself. But, as the *1180 Board pointed out in Belle-Vue Manufacturing Co., 43 B. T. A. 12, 16:
It is probably true that, under the circumstances and consistently with the spirit of the trust agreement and the contract extending the time for payment of the notes, no dividends would be declared by petitioner because the controlling trustee-creditors would not permit it; and that a request for such permission “would have been a vain and purposeless thing.” Kilby Steel Co., 41 B. T. A. 1237. But petitioner never agreed to refrain from declaring a dividend. « * * Even though its financial condition was an effective obstacle to any such payment, .the statute provides only for a contractual inhibition. * * * The directors, however, had full power to declare a dividend if the petitioner’s condition warranted it. It was the financial condition and not a contractual prohibition that prevented the payment of a dividend. Section 26 (c) (1) provides for no credit in such case.
There is a further attempt to rely on a contract in writing executed by the corporation in 1937, by reason of the inclusion therein of the phrase “continuing the agreement which has existed.” Since we have concluded that no such agreement existed or that, if it did, it was oral and not written, no arrangement made after the event can supply the missing requirement of a written agreement executed prior to May 1, 1936. Otherwise the meticulous care used by Congress in limiting the scope of the credit provisions could be completely frustrated.
Petitioner also claims that the sinking fund provisions of the indentures require the allowance of a credit under section 26 (c) (2) for portions of petitioner’s earnings paid or set aside to discharge indebtedness incurred prior to May 1, 1936. The amended agreement required deposit in a sinking fund of stipulated amounts for each barrel of petitioner’s product “manufactured and shipped.” In order to comply with the statute it must be found that this provision “expressly deals with the disposition of earnings and profits of the taxable year.” The Board has in several instances proceeded to great lengths in imputing to contractual provisions the intention expressly to deal with earnings and profits, and even went so far in Moloney Electric Co., 42 B. T. A. 78, as to meet with the disapproval of the Circuit Court on review (Helvering v. Moloney Electric Co. (C. C. A., 8th Cir.), 120 Fed. (2d) 617. However, in that case and in Michigan Silica Co., 41 B. T. A. 511, the Board was able to find in other provisions of the contract evidence that the parties intended that the payments in question should be made from earnings and profits of the taxable year.
In Moloney Electric Co., supra, the Board said (p. 87) :
The paragraph of the trust agreement set out in our findings does expressly deal with the disposition of earnings and profits of the taxable year even though the provision * * * taken from its setting, makes no specific reference to earnings and profits. It is apparent, however, the parties intended that *1181 petitioner’s net earnings and profits sliould be applied * * * toward the payment of the bonds * * *.
In Michigan Silica Co., supra, certain payments were to be made to a sinking fund “based upon the sand produced and sold during the preceding month. As showing that the payments were to be made out of the proceeds of sale”, the Board said (p. 513) :
* * * it was provided that in ease the company had not received payment for the sand sold, it might defer payment to the trustee until it had received such payment, but for not more than 60 days. It further provided that at such times as the trustee requested, petitioner must render an account of all sand sold and payments received therefor. * * *
In G. B. R. Oil Corporation, 40 B. T. A. 738. and Joell Co., 41 B. T. A. 825, the provision required application to the indebtedness of all of the debtor’s receipts. It was concluded that the greater must include the less and that within the receipts would be found all of the year’s earnings and profits.
It is impossible to discover any such aids to leniency in the present record. The amount to be paid was measured not by sales, but by shipments. There is no showing that the two coincided. For all we know, shipments could have been made to warehouses, to consignees, or for purposes entirely unconnected with sale. Payments may have borne no relationship whatever to quantity shipped, either because of credit terms, uncompensated losses in transit, or a host of other possibilities. The minimum payment was required, regardless even of any manufacture or of any shipment. We see no tenable foundation for a determination that payments to the sinking fund were so associated with earnings, profits or even receipts, either in theory or in practice, that it can be inferred that the parties intended the payments to be made out of earnings and profits, and that accordingly there is an express reference thereto. On the contrary, it is entirely evident that the payments in question were called for even though there were no receipts, much less earnings and profits; and, conversely, the sums due could rightfully be paid out of any source within the company’s command. As the Board said in C. A. Roberts Co., 44 B.T.A. 605:
⅜ * * payments will comply with the provisions of the notes regardless of the source from which the payments are made. Thus, the petitioner could have made payments on the notes from any source whatsoever and could have distributed all of its earnings of the taxable years without in any way violating provisions of the notes. * * *
We are accordingly compelled to reject petitioner’s claim under both subsections.

Decision will be entered under Rude 50.